## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN C. PATTERSON,<br><br>Defendant. | Civil Action No.: 8:23-cv-00193<br><br>**ORIGINAL COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

Plaintiff, Agilent Technologies, Inc. ("Plaintiff" or "Agilent"), brings this complaint for trade secret misappropriation under the Defend Trade Secrets Act, trade secret misappropriation under the Florida Uniform Trade Secrets Act, and breach of contract.

## NATURE OF THE ACTION:

1.      This is an action for: (i) trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b); (ii) trade secret misappropriation under the Florida Uniform Trade Secrets Act, § 688.001, Fla. Stat. (2022) *et seq.*; and (iii) breach of contract.

2.      Agilent seeks damages, injunctive relief, and declaratory relief under 35 U.S.C. § 281 et seq., 18 U.S.C. § 1836 (b)(3), §§ 688.003–.004, Fla. Stat. (2022). and 28 U.S.C. § 2201.

## THE PARTIES

3.      Agilent is a Delaware corporation with its principal place of business at 5301 Stevens Creek Blvd., Santa Clara, California 95051.

4.      Upon information and belief, defendant Brian C. Patterson ("Defendant"), is an individual residing in or around Parrish, Florida.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the Defend Trade Secrets Act claim pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), because the

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

action arises under the Defend Trade Secrets Act.

6.     This Court has subject matter jurisdiction over the state law trade secret claim and breach of contract claim pursuant to 28 U.S.C. § 1367, because these claims are so related to other claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

7.     On information and belief, Defendant is subject to personal jurisdiction of this Court at least because Defendant is a resident of this district.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this judicial district.  Venue is also proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b)(2) and Local Rule 1.04 because a substantial part of the events giving rise to these causes of action took place within this judicial district and division, and the action is most directly connected to this division.

## FACTUAL BACKGROUND

### A.     Agilent

9.     Agilent was established in 1999 when it was spun off from Hewlett-Packard. Headquartered in Santa Clara, California, Agilent and its subsidiaries employ approximately 18,000 people across its 32 offices worldwide.

10.    Agilent is a world-leading research, development, and manufacturing company whose laboratory products and services target the food,

environmental and forensics, pharmaceutical, diagnostics, chemical and energy, and research markets, among others. Agilent's solutions enable its customers to address global trends that impact human health and the environment, and to anticipate future scientific needs. Its innovative technologies provide scientists and healthcare workers tools to fight cancer, improve quality of life, and enable new discoveries. Agilent advances quality of life with a broad range of high-quality solutions to customers in 110 countries.  For example, Agilent provides laboratories with instruments, services, consumables, applications, and expertise, enabling customers to achieve their research, production, therapeutic, and discovery goals.  Agilent instruments, software, and sample preparation solutions help scientists at top-tier universities conduct faster, more accurate research to learn more about cancer, cardiovascular diseases, diabetes, Alzheimer's, Parkinson's, autism, and other ailments.  Agilent solutions further help pathology laboratories deliver fast, accurate information to the physicians, hospitals, and medical centers they serve.  Agilent solutions also provide precise answers for every segment of the pharmaceutical industry, from disease research and drug discovery to drug development, manufacturing, and quality control.

11.    One of Agilent's business divisions, the Diagnostics and Genomics Group (DGG), focuses on developing and marketing instruments, software, consumables, and automation for hospitals and research laboratories worldwide

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

using Agilent's pathology reagents, instruments, software, and expertise to make accurate tissue-based diagnoses and determine the most effective treatments for cancer patients.   Products and solutions developed by the DGG enable customers in the clinical and life sciences research areas to interrogate samples at the cellular and molecular level, through automated separation of bio molecules including nucleic acids (RNA and DNA), proteins, and other small molecules.

12.     Agilent supplies its DGG solutions, across the United States and worldwide, to customers in the clinical and life science research industries, among others. Agilent has invested millions of dollars in developing and marketing DGG technology, including the technology underlying the causes of action in this case.

**B.   The Defendant**

13.     From March 21, 2005 until December 12, 2022, Defendant was an employee of Agilent.  At the end of his employment, Defendant held the position of Regional Associate Vice President – Sales within Agilent's Diagnostics and Genomics Group ("DGG").   In Defendant's role in the DGG, Defendant was responsible for planning and directing all sales activities, including forecasts, policies, strategies and customer relationship management and had access to and regularly used financial performance data and projections, proprietary customer lists, and detailed information regarding existing and planned future product releases.

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

14. Defendant was a full-time remote worker for Agilent, using a laptop computer and cell phone provided by Agilent to connect to Agilent's secure computing environment through a Virtual Private Network ("VPN").

15. On December 12, 2022, Agilent terminated Defendant's employment, and began the process of removing his access to Agilent's computer systems.

16. During the exit interview in which Agilent terminated Defendant's employment, Agilent instructed Defendant to return Agilent's laptop computer and cell phone without destroying the contents.

17. On or about December 15, 2022, Defendant shipped the Agilent-owned laptop to Agilent. Also included in the shipment was an older iPhone 6 phone (serial number FFMRPBD3G5MG). On December 20, 2022, the laptop arrived at Agilent's offices.

18. On December 27, 2022, Agilent personnel returned to the office, inspected the computer and phone, and determined that the hard drive of the laptop had been erased, and Agilent was unable to recover any information from the hard drive. Similarly, the iPhone 6 had been wiped, and Agilent determined that the returned phone was not the Agilent phone Defendant was issued at the time of his termination.

19. On information and belief, Defendant retains possession of the iPhone XR (serial number X3ZG0GUKXKW) which he was assigned by Agilent at the time

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

of his termination.

20.    Because the laptop and phone had been erased, Agilent performed forensic investigation of Defendant's actions before his access to Agilent's computer systems was disabled.

21.    Agilent maintains Data Loss Prevention ("DLP") software on its computing systems that, among other features, creates a log whenever files are transferred  from an Agilent computer system to removable media (such as a USB hard drive or "thumb" drive).

22.    Agilent's review of logs from the DLP software revealed that, after Agilent notified Defendant of his termination, Defendant transferred over 15,900 unique files from his Agilent-issued laptop to removable media.

23.    By matching SHA5 checksums (a form of digital fingerprint for a file) between the DLP log and files within Agilent's OneDrive storage system, Agilent has been able to identify over 9,500 of the files that Defendant transferred.  Agilent has not been able to identify the other approximately 6,000 files transferred.

24.    As discussed in further detail below, the files which Agilent was able to specifically confirm that Defendant transferred include Agilent trade secrets, and other Agilent confidential information.

C.    **Agilent's Trade Secrets at Issue**

25.    Agilent's product marketing strategies, competitive analyses, product

development, product timelines, financial projections, plans and information about potential mergers and acquisitions, and customer lists are trade secrets. Agilent has developed these trade secrets by making extensive investments of time and resources.

26.     Agilent's trade secrets derive independent economic value from their secrecy. The trade secrets misappropriated by Defendant include, but are not limited to: confidential product roadmaps for upcoming products/commercialization plans, including those for products in development and anticipated product launch timing; lists of top customers with detailed accounting for all of the customers' purchases; and confidential Agilent contract information.

27.     These types of information give Agilent a competitive edge, allowing it to both provide state of the art products, to understand market needs, and to gain competitive advantage over competitors.  These types of information are closely guarded and distributed within Agilent on a need-to-know basis. Disclosure of this information to the general public, or to Agilent's competitors would harm Agilent.

28.     Possession of these trade secrets by a competitor would provide economic advantage to those who do not otherwise have access to the information.

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

**D.**    **Agilent Has Taken Reasonable Efforts to Protect its Trade Secrets**

29.    Agilent has taken deliberate, specific steps to prevent inadvertent or improper disclosure of Agilent's trade secrets, including through physical security, electronic security, and personnel policies and restrictions.

30.    Agilent employees working remotely, including Defendant, use Agilent issued laptops and connect securely to Agilent's networks through a VPN using two-factor authentication. Any computer or phone used to connect to Agilent systems has specific login and password requirements to access Agilent information.

31.    Agilent maintains technological measures, including but not limited to Data Loss Prevention software, to prevent unauthorized access to Agilent's files, including by Agilent employees who otherwise would have access to the files in the course of their employment.

32.    In addition to this physical and electronic security, Agilent takes routine steps to protect its trade secrets. Attached as Exhibit A is a true and correct copy of Agilent's Standards of Business Conduct ("SBC") that was published in an April 2022 revision, and in force during the time of Defendant's employment. The SBC is created and maintained in the ordinary course of Agilent's business. As seen in Section 2.1, the SBC defines sensitive information as: (1) information about Agilent's business including new product research product specifications and

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

designs, business strategies, customer lists and marketing plans; (2) nonpublic financial information including forecasts, pricing strategies and budget information; (3) employee information; and (4) information about third parties including customers, suppliers, resellers, research partners and other third parties Agilent has been entrusted to protect. This Section reminds employees that before any employee can disclose sensitive information—either inside or outside of Agilent—the employee must make ensure that: there are "good business reasons for sharing it," they are authorized to disclose the information, they are sharing it with someone who is authorized to see the sensitive information, and they inform the recipient of the information that the information is sensitive and ensures the recipient understands the restrictions related to the use and dissemination of that information. The policy places a responsibility on every employee to protect sensitive information, and notes that responsibility continues after the employee leaves Agilent.

33.    Also, compliance with the SBC is mandatory for all employees, regardless of location, and the SBC expressly states that "a violation of the SBC is considered misconduct, for which employees can be subject to discipline, including immediate termination of employment at Agilent." Ex. A at pp. 5-6.

34.    Defendant signed an "Agreement Regarding Confidential Information and Proprietary Developments ("ARCIPD") with Agilent. Attached

as Exhibit B to this Complaint is a true and correct copy of the ARCIPD agreement between Agilent and Defendant, signed by Defendant on March 21, 2005.

35.    The ARCIPD expressly covers "trade secrets, confidential business and technical information, and know-how not generally known to the public" which it defines as "Confidential Information." Ex. B (ARCIPD) ¶ 2.

36.    The ARCIPD further explains that "Confidential Information may include, without limitation, information on Agilent organizations, staffing, finance, information of employee performance, compensation of other, research and development, manufacturing and marketing, as well as information which Agilent receives from others under an obligation of confidentiality." *Id.*

37.    Under the ARCIPD, Defendant agreed to "use such information only in the performance of Agilent duties," to "hold such information in confidence and trust," and to "use all reasonable precautions to assure that such information is not disclosed to unauthorized persons or used in an unauthorized manner, both during and after [Defendant's] employment with Agilent." *Id*.

38.    Defendant also agreed that "[t]he product of all work performed by me during and within the scope of my Agilent employment … will be the property of Agilent; and Agilent will have the sole right to use, sell, license, publish, or otherwise disseminate or transfer rights in such a work product." *Id*. at ¶ 5.

39.    Also pursuant to the ARCIPD, Defendant agreed that Defendant

would "not remove any Agilent property from any Agilent premises without Agilent's permission." *Id.* at ¶ 6.

40.    Agilent performs exit interviews with all departing employees, including a review of the ARCIPD agreement between the employee and Agilent. During Defendant's exit interview on December 12, 2022, Agilent reviewed the contents of the ARCIPD with Defendant.  On the same day, Agilent sent a reminder copy of the ARCIPD (along with a memo summarizing the exit interview and other documents reviewed during the exit interview) via both electronic mail to Defendant's personal email address and U.S. Mail.

41.    In addition to the policies and employment agreements described above, all Agilent employees are required to complete annual training regarding trade secrets and confidentiality.  This includes training reviewing the SBC, and other training regarding trade secrets, confidentiality, and security awareness.

42.    As part of its efforts to ensure the security of its confidential information, and for other purposes in the ordinary course of its business, Agilent creates and maintains a database of training modules completed by each employee during their employment.  These records show that Defendant participated in multiple required training courses related to Agilent's Standards of Business Conduct or its information Security practices.

E.    <u>**Defendant's Misappropriation**</u>

43.    As indicated by a log from Agilent's DLP software, on or about December 12, 2022, Defendant copied 15,946 unique electronic files to removable media – two separate USB storage drives.

44.    Based on confirming matching digital signatures between the DLP log and files with Agilent's computer systems, Agilent was able to identify approximately 9,500 of the files Defendant copied.  The identified files that Defendant copied to removable media include files that contained Agilent's confidential and proprietary information, including Agilent's trade secrets.  These files include but are not limited to:

- documents containing confidential information concerning Agilent's customers;

- documents containing confidential information concerning Agilent's competitors, including competitive analyses;

- documents containing Agilent's confidential product plans and projections; and

- documents containing Agilent's confidential pricing information.

45.    Defendant did not turn any removable media over to Agilent at any time.

## COUNT 1 – MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA

46.   The foregoing paragraphs are incorporated herein by reference.

47.   This is a cause of action for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), based on the misappropriation of Agilent's trade secret information through wrongful acquisition, use, and/or disclosure.

48.   Agilent's proprietary information was a trade secret because the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, and Agilent has taken reasonable measures to keep such information secret.

49.   Agilent is the "owner" of the proprietary information at issue, as the term is defined in 18 U.S.C. § 1839(4).

50.   Agilent's proprietary information is used in, or intended for use in, interstate and/or foreign commerce.  The proprietary information includes financial information relating to national and international projects and growth. Agilent distributes and plans to distribute the products to which the proprietary information relates across the United States and internationally, as disclosed in the product plans, projections, and other materials that Defendant misappropriated.

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

51.    Defendant gained access to Agilent's proprietary trade secret information in the course of his employee-employer relationship with Agilent. Defendant was under an obligation to maintain the secrecy of Agilent's trade secret information obtained during Defendant's employment by Agilent.

52.    In Defendant's position as an Associate Vice President, Defendant had access to highly confidential, proprietary documents containing the details not only of Agilent's Diagnostic and Genomic Group products, but also Agilent's customer information, plans and preference, information concerning Agilent's plans in relation to its competitors, as well as Agilent's strategy and plans, marketing plans, financial projections, project analyses, and growth plans. Agilent protects these materials by restricting access to these documents only to authorized persons whose positions at Agilent demand access to this kind of highly sensitive information.

53.    Specific examples of trade secrets that Defendant misappropriated include the timing and specifications of new products scheduled for release in 2023, as well as specific actual and forecast revenue for specific products, and lists of top customers along with their purchase amounts.

54.    The materials that Defendant misappropriated include at least the period of 2016 through just before Defendant's departure from Agilent in December 2022 and covered a wide range of subjects as set forth in this complaint,

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

indicating that Defendant wanted continued access to use Agilent trade secrets after Defendant's employment ended at Agilent.

55.     As a direct and proximate result of Defendant's willful, improper, and unlawful use and disclosure of Agilent's proprietary information, Agilent has suffered actual loss as a result of the exposure of its trade secrets and the costs incurred in remedying the theft.

56.     These acts of wrongfully misappropriating Agilent's proprietary information were and continue to be willful and malicious, warranting an award of exemplary damages, as provided by 18 U.S.C. § 1836(b)(3)(C) and an award of attorneys' fees, as provided by 18 U.S.C. § 1836(b)(3)(D).

## COUNT 2 – MISAPPROPRIATION OF TRADE SECRETS UNDER UTSA

57.     Each of the foregoing paragraphs are incorporated herein by reference.

58.     This is a cause of action for misappropriation of trade secrets under the Florida Uniform Trade Secrets Act, § 688.001, Fla. Stat. (2022), *et seq.*, based on the misappropriation of Agilent's trade secret information through wrongful acquisition, use, and/or disclosure.

59.     Agilent's proprietary information was a trade secret because the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper

means by, another person who can obtain economic value from the disclosure or use of the information, and Agilent has taken reasonable measures to keep such information secret.

60.    Defendant gained access to Agilent's proprietary trade secret information in the course of his employee-employer relationship with Agilent. Defendant was under an obligation to maintain the secrecy of Agilent's trade secret information obtained during Defendant's employment by Agilent.

61.    In Defendant's position as an Associate Vice President, Defendant had access to highly confidential, proprietary documents containing the details not only of Agilent's Diagnostic and Genomic Group products, but also Agilent's customer information, plans and preference, information concerning Agilent's plans in relation to its competitors, as well as Agilent's strategy and plans, marketing plans, financial projections, project analyses, and growth plans. Agilent protects these materials by restricting access to these documents only to authorized persons whose positions at Agilent demand access to this kind of highly sensitive information.

62.    Specific examples of trade secrets that Defendant misappropriated include the timing and specifications of new products scheduled for release in 2023, as well as specific actual and forecast revenue for specific products, and lists of top customers along with their purchase amounts.

63.     The materials that Defendant misappropriated include at least the period of 2016 through just before Defendant's departure from Agilent in December 2022 and covered a wide range of subjects as set forth in this complaint, indicating that Defendant wanted continued access to use Agilent trade secrets after Defendant's employment ended at Agilent.

64.     As a direct and proximate result of Defendant's willful, improper, and unlawful use and disclosure of Agilent's proprietary information, Agilent has suffered actual loss as a result of the exposure of its trade secrets and the costs incurred in remedying the theft.

65.     These acts of wrongfully misappropriating Agilent's proprietary information were and continue to be willful and malicious, warranting an award of exemplary damages, as provided by § 68.004(2), Fla. Stat. (2022).

## COUNT 3 – BREACH OF CONTRACT

66.     Each of the foregoing paragraphs is incorporated herein by reference.

67.     Agilent's ARCIPD—signed and accepted—constitutes a valid contract between Defendant and Agilent.

68.     The ARCIPD explains that Confidential Information "may include, without limitation, information on Agilent organizations, staffing, finance, information of employee performance, compensation of other, research and development, manufacturing and marketing, as well as information which Agilent

receives from others under an obligation of confidentiality."  Ex. B, ARCIPD ¶ 2.

69.     The ARCIPD requires that Defendant "use such information only in the performance of Agilent duties," "hold such information in confidence and trust," and "use all reasonable precautions to ensure that such information is not disclosed to unauthorized persons or used in an unauthorized manner, both during and after [Defendant's] employment with Agilent."  *Id.*

70.     Also pursuant to the ARCIPD, Defendant agreed that Defendant would "not remove any Agilent property from any Agilent premises without Agilent's permission."  *Id.* ¶ 6.

71.     Defendant's employment with Agilent ended on December 12, 2022. As set forth above, Defendant copied numerous electronic files containing Agilent's confidential and proprietary information to removable storage devices. These files contained Agilent's confidential, proprietary, and trade secret information.

72.     Defendant did not return any removable storage devices to Agilent. Likewise, Defendant did not return Agilent's iPhone XR with serial number DX3ZG0GUKXKW.

73.     Accordingly, Defendant removed Agilent's property from Agilent's premises without Agilent's permission, in breach of the ARCIPD.

74.     More importantly, under the ARCIPD, Defendant agreed to use all

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

Agilent Confidential Information "only in the performance of [Defendant's] duties."

75.     Removal of copies of Agilent Confidential information on a removable storage device and retention of that information after Defendant's termination was not in performance of any duty for Agilent.

76.     Further, on information and belief, Defendant has continued to use the materials that Defendant copied since departing Agilent, violating the terms of at least the above contract with Agilent.

77.     It is possible that Defendant has copied information contained on the USB storage device to other systems, including systems or storage.

78.     As a result of Defendant's breach, Agilent has incurred damages and will continue to incur damages as it discovers the full extent of Defendant's breach of contract and incurs the cost of securing its information.

79.     Moreover, based upon Defendant's conduct in copying Agilent's electronic files and retaining them after the conclusion of Defendant's employment at Agilent, upon information and belief, Defendant has continued to use information that is confidential or proprietary to Agilent.

80.     In addition, the potential damage to Agilent from Defendant's breach of Defendant's agreements with Agilent is not limited to those relating to Defendant's personal use of the information, in that Agilent's confidential,

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

proprietary, and trade secret information are no longer under Agilent's control, as Defendant could disseminate such information to competitors or otherwise publicly.

## **PRAYER FOR RELIEF**

Wherefore, Agilent respectfully requests the following relief:

1.    a preliminary and permanent injunction pursuant to 18 U.S.C. § 1836(b)(3) enjoining Defendant from disclosing or using any Agilent trade secret or other Agilent confidential information in Defendant's possession to anyone;

2.    an order pursuant to 18 U.S.C. § 1836(b)(3)(A)(ii) requiring that Defendant submit to a forensic analysis of all devices and e-mail accounts within Defendant's possession, custody and control to: a) provide Agilent complete disclosure of the dissemination of Agilent's confidential and proprietary information; and b) to ensure the complete removal of all Agilent confidential material from the possession of Defendant and others;

3.    an award of monetary damages in an amount to be proven at trial;

4.    costs of suit incurred herein;

5.    pre-and-post judgment interest;

6.    attorneys' fees and costs; and

7.    for such other and further relief as this Court may deem appropriate.

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**

## JURY DEMAND

Agilent requests a trial by jury on all issues so triable.

Dated: January 27, 2023          Respectfully submitted,

/s/ Edward M. Mullins

Edward M. Mullins (Fl. Bar No. 863920)
REED SMITH LLP
200 S. Biscayne Blvd.
Suite 2600
Miami, FL 33131
786.747.0203
emullins@reedsmith.com

Michael J. Forbes (*Pro Hac App. Forthcoming*)
Peter J. Chassman (*Pro Hac App. Forthcoming*)
REED SMITH LLP
811 Main St.
Suite 1700
Houston, TX 77002
713.469.3864
mforbes@reedsmith.com
pchassman@reedsmith.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

**ORIGINAL COMPLAINT – DEMAND FOR JURY TRIAL**